UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES A. M.,

       *Plaintiff,*               CASE NO. 22-12334

                                     DISTRICT JUDGE SHALINA D. KUMAR

*v.*                          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF
SOCIAL SECURITY,

        *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12 and 14)**

## I. RECOMMENDATION

Considering the entire record in this case, I suggest that the Commissioner of Social Security relied on substantial evidence in finding that Plaintiff, Plaintiff, was not disabled. Accordingly, I recommend the Court **DENY** Plaintiff's motion for summary judgment (ECF No. 12), **GRANT** the Commissioner's motion for summary judgment (ECF No. 14), and the case be **AFFIRMED**.

## II. REPORT

### A. Introduction and Procedural History

Plaintiff applied for supplemental security income ("SSI") on August 15, 2019, alleging that his disability began on October 9, 2018. (ECF No. 6-2,

PageID.100).  The SSA denied his SSI claim at the initial level on October 22, 2019, and again on reconsideration on December 19, 2019.  (*Id.*).  Plaintiff then requested a hearing before an ALJ which was held on August 12, 2021.  (*Id.*).  The ALJ issued a decision on August 25, 2021, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (*Id.*).  The Appeals Council denied review on August 6, 2022.  (ECF No.6-2, PageID.22).

Plaintiff then filed a complaint seeking judicial review of the ALJ's final decision on October 3, 2022.  (ECF No. 1).  This case was referred to Judge Jonathan J.C. Grey on January 4, 2023.  (ECF No. 10).  Both parties then filed cross-motions for summary judgment.  (ECF Nos. 12 and 14).  On March 13, 2023, the case was reassigned to the undersigned.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405 (g) (2018).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2016); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must

provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2016).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2016)).

### D.  ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff has not been under a disability since August 15, 2019, the date his application was filed.  (ECF No. 6-2, PageID.112).  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since August 15, 2019, the date he applied for SSI.  (*Id.* at PageID.102).  At Step Two, the ALJ found the following severe impairments: carpal tunnel syndrome, degenerative disc disease, and osteoarthritis.  (*Id.*).  He found the following conditions to be non-severe:

- Assessed hypertension and hypercholesterolemia as there was little in the record "to indicate that [those] impairments affect[ed] the claimant's functioning on an ongoing basis" (*id.*);

- Level III BMI (body mass index equal to or greater than 40) as it did not cause significant limitations in his ability to perform basic work activities (*id.* at PageID.102–03); and

- Anxiety and depression, considered independently and collectively, as they did not cause more than minimal limitation in his ability to perform basic mental work activities (*id.* at PageID.103).

The ALJ found that Plaintiff experienced mild limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.* at PageID.103–04). Next, he found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b) except he can frequently climb ramps or stairs; is limited to frequent handling, feeling, and fingering, bilaterally; and must avoid concentrated exposure to vibration. (*Id.* at PageID.105).

At Step Four, the ALJ found that Plaintiff is capable of performing past relevant work as a yard worker. (*Id.* at PageID.111). At Step Five, the ALJ explained that the vocational expert "testified that a hypothetical person with the

same vocational profile and limitations as the claimant could return to past work, as a yard worker, as actually performed." (*Id.*).  Accordingly, the ALJ concluded that Plaintiff had not been disabled, as defined in the Social Security Act, since August 15, 2019.  (*Id.* at PageID.112).

### E.  Background

- **Medical Evidence**

In October 2018, Plaintiff was injured when he fell through a roof while working for Spray Tight.   (ECF No. 6-3, PageID.177, 182; ECF No. 6-8, PageID.674).  His October 2018 Hurley Medical Center ("HMC") records reflect that he was in pain the day after his accident and experienced difficulty ambulating and sitting along with periodic numbness in his right hand.  (*See, e.g.*, ECF No. 6-8, PageID.561, 568, 572).  He was also given a rolling walker.  (*See id.* at PageID.565).  The October 2018 HMC Radiology report showed signs of "[d]egenerative disc disease of the mid cervical spine most pronounced on the right at the C3-C4 level." (*Id.* at PageID.593).

Dr. Jawad Shah's, Insight Neurosurgery & Neuroscience, November 2018 treatment note indicates that Plaintiff came to see him following his stay at HMC with complaints of "increased back pain as well as neck [pain] after a fall."  (*Id.* at PageID.731).  The imaging revealed "bone marrow edema involving L4-L5 vertebra and superior endplate at S1, protrusion at L5-S1 with central canal stenosis, right

7

paramedian disc herniation at L4-L5, and degenerative disc disease of the mid cervical spine at C3-C4." (*Id.*).  Dr. Shah's assessment was Plaintiff had: (i) spinal stenosis, lumbar region without neurogenic claudication, L4-L5 lateral recess, (ii) intervertebral disc disorders with radiculopathy, lumbar region, (iii) essential (primary) hypertension, (iv) pure hypercholesterolemia, unspecified, (vi) morbid (severe) obesity due to excess calories, and (vii) body mass index of 40.0–44.9. (*Id.* at PageID.729).  Dr. Shah also noted Plaintiff had "significant pain in his back going down into his leg on the right side with an L4-L5 lateral recess stenosis and facet splay." (*Id.* at PageID.732).  The recommendation was for Plaintiff to start physical therapy three times a week for one month, obtain epidural steroid injections, and avoid working for three months.  (*Id.*).  The March 2019 treatment notes indicate that Plaintiff continued to experience back pain that was "quite severe and constant, heavy, shooting, and sharp in nature with associated tingling and numbness into the right lower extremity to the level of the foot." (*Id.* at PageID.813).

Plaintiff saw Dr. Shah again in April 2019 and the note states that he experienced (i) spinal stenosis in his lumbar region without neurogenic claudication, (ii) radiculopathy in his lumbar region, (iii) unspecified osteoarthritis in an unspecified site, (iv) essential (primary) hypertension, (v) pure hypercholesterolemia, (vi) morbid (severe) obesity due to excess calories, and (vii) body mass index of 36.0-36.9.  (*Id.* at PageID.729).  Dr. Shah's notes reflect that

Plaintiff continued to suffer from "radicular pain," experiencing "significant discomfort," and recommended he avoid working for another three months. (*Id.*). His July 2019 treatment notes reflect the same assessment as his April 2019 treatment notes and he again recommends Plaintiff avoid working, but this time for about six months. (*Id.* at PageID.726–27). He also recommends Plaintiff follow up with an MRI of his lumbar spine to determine surgical planning after Plaintiff consulted him regarding his continued symptoms of low back pain. (*Id.*). The September 2019 consultation note indicated Plaintiff "presented with continued symptoms of low back pain with a radicular component" and despite having "tried a variety of conservative treatments," Plaintiff remained debilitated. (*Id.* at PageID.1070). Dr. Shah again recommended he avoid working for six months and follow up in the office with an MRI of his lumbar spine, to further determine surgical planning. (*Id.*). The note goes on to say that Plaintiff had "significant and profound pain in his right leg, secondary to L4-L5 lateral recess stenosis and L5-S1 neuroforminal stenosis." (*Id.*).

The November 2018 Valley Medical Center ("VMC") notes reflect Plaintiff had "[n]o difficulty walking or standing" while there was "[p]ositive tenderness to back from neck to lumbar spine" and "positive decreased sensation to right hand." (ECF No. 6-8, PageID.739–40). In December 2018, the notes reflect Plaintiff had "[n]o difficulty walking or standing" and there was a normal examination of right

upper extremity but also note bilateral carpal tunnel syndrome. (*Id.* at PageID.747). The January 2019 VMC medical note indicated Plaintiff was complaining of back pain and had a history of degenerative disc disease ("DDD") of the lumbar spine from his fall, and neuralgia to right hand. (*Id.* at PageID.749–750). The notes also reflect that although he complained of back pain he had "[n]o difficulty walking or standing." (*Id.* at PageID.750). The February 2019 VMC treatment note indicated normal examination of right upper extremity but a history of DDD of lumbar spine and bilateral carpal tunnel syndrome. (*Id.* at PageID.757, 762). The May 2019, June 2019, and August 2019 VMC treatment notes indicated DDD of the lumbar spine with an active onset date of November 12, 2018 and bilateral carpal tunnel syndrome. (*Id.* at PageID.763, 767–68, 772, 775, 779, 793). The medication list during this period reflected that Plaintiff had bilateral wrists braces, for use as tolerated, and was prescribed Mapap (acetaminophen), Naprosyn (naproxen), and Tramadol at various points. (*See, e.g.*, PageID.761).

The January 2019 notes from Karen Reedy indicate Plaintiff frequently sleeps on the couch on the main floor to avoid stairs and currently uses a shower chair. (*Id.* at PageID.806). Physical Therapy FUV treatment notes from the same month indicated Plaintiff experienced a pain level of nine on a ten-point scale associated with his lower back but the notes indicated that Plaintiff's "affect [did] not give [an] indication of 9/10 pain" and that he ambulated with a normal gait. (*Id.* at

PageID.718, 720).   His February 2019 physical therapy notes indicated increased bilateral hand strength, increase in grip and pinch strength, and decrease paresthesias.   (*Id.* at PageID.694, 696).   Throughout the notes, Plaintiff's self-reported pain level is noted to vary between a seven and ten on a ten-point scale. (*See*, *e.g.*, *id.* at PageID.710, 712).

Rachel Sullivant, D.C.'s notes from February 2019 to May 2019, July 2021 to September 2021, and December 2021 reflect complaints of neck pain, low back pain, bilateral leg pain, and right arm numbness.   (*See, e.g.*, ECF No. 6-2, PageID.70, 87, 120, 128, 132, 136, 138, 142, 148, 155, 157, 1155, 1166, 1168, 1175, 1179, 1181, 1186, 1188, 1292, 1301, 1305, 1311, 1316, 1320, 1324, 1328).   The low back pain rating ranged between a six to ten on a ten-point scale.   (*Id.*).   And the bilateral leg pain was consistently rated between a six to eight on a ten-point scale.   (*Id.)*. Chrystin Schultz's, PTA August 2021 notes reflect Plaintiff self-reported experiencing pain between a six to eight on a ten-point scale but "carryover in pain relief from previous [physical therapy] treatment sessions."   (*See, e.g.*, *id.* at PageID.122, 130, 134, 140, 153).

Plaintiff underwent surgery on August 27, 2020.  (*Id.* at PageID.1227).  About three months later, Dr. Shah met with him for his post-operative visit and while Plaintiff experienced improvement in his radiculopathy, his back pain persisted.  (*Id.* at PageID.1228).  Dr. Shah's January 2021 notes indicated that while Plaintiff still

experienced discomfort he was "incrementally improving and [. . .] is walking with a normal gait." (*Id.* at PageID.1234).  Compared to earlier treatment notes, there is no notation recommending Plaintiff avoid working.  The only note is for further follow up in three months and a referral back to his primary care physician.  (*Id.* at PageID.1234).

- **Medical Source Statement**

Dr. Michael Owczarzak, VMC, submitted a Medical Source Statement which stated that Plaintiff could only sit for 3 hours in an 8-hour workday, stand for an hour, and walk for a half an hour in a workday.  (ECF No. 6-8, PageID.951).  Further, Plaintiff would be able to sit for an hour, stand for a half an hour, and walk for fifteen minutes without interruption.  (ECF No. 6-8, PageID.951).  Jaafer Beydoun, NP also submitted a Medical Source Statement dated June 10, 2021(ECF NO.6-12, PageID.1759–60).  His statement indicated that in an 8-hour workday Plaintiff could only sit for thirty minutes, stand for thirty minutes, or walk for thirty minutes.  (*See id.*).  And that at no point could he bend, squat, kneel, or stoop.  (*See id.*).

- **Function Reports**

Fred J., friend of Plaintiff, submitted a third-party function report.  (ECF No. 6-7, PageID.435).  In the report, Fred states that when spending time with Plaintiff they barely do anything because of his back and legs.  (*Id.*).  Based on his observations, Plaintiff cannot bend or move fast enough to work.  (*Id.*).  Further, his

back "will give out" if he stands for too long, he cannot perform "most duties" as his right hand "barely works," and he is unable to sit for long periods of time or to complete tasks with his right hand.  (*Id.* at PageID.435–36).

In his August 29, 2019 function report, Plaintiff stated he had pets which he would feed and bathe himself on occasion.  (*Id.* at PageID.380).  He also represented that he can prepare his own melas, which include sandwiches and Hungry-Man frozen dinners, on a weekly or monthly basis, and the process would take him a few hours to complete.  (*Id.* at PageID.381).  He also submitted a Recent Medical Treatment form on which he identified Flexeril, Norco, Naprosyn, and Norton as the medications he was currently taking.  (*Id.* at PageID.434).  On the form he explained that Flexeril was a medication he was taking to keep him relaxed and not in pain. (*Id.*).

- **Plaintiff's Testimony at the Administrative Hearing**

Prior to his accident[1], Plaintiff worked two separate jobs where he made substantial gainful amounts (*i.e.,* about $1,000 a month) — self-employed yard worker and Inland Waters Personnel Company chemical spill cleaner.  (ECF No. 6-3, PageID.172–73).  At the time of the hearing, he was not currently working.  (*Id.* at PageID.172).

---

[1] The ALJ only considered jobs worked by Plaintiff within the last 15 years before his accident in October 2018.  (ECF No. 6-3, PageID.172).

Plaintiff testified that when working as a yard worker cutting grass, he worked 40 hours a week and lifted no more than 15 pounds. (*Id.*). He did not have to lift bags of grass to relocate them. (*Id.*). Despite these job restrictions, he testified that he was unable to return to yard work because he had surgery on his back in August 2020 and could barely bend over. (*Id.* at PageID.173). Further, he had been experiencing paralysis in sections of his legs and arms and was unable to use his right arm as he could not feel anything. (*Id.* at PageID.174–76). In addition, he put on a significant amount of weight as he could no longer walk or stand for extended periods of time due to his injuries. (*Id.* at PageID.174–75). He also testified that his "legs don't walk right" and he had been using a walker since October 2018 both inside and outside of the home. (*Id.* at PageID.175, 178).

Plaintiff went on to testify about the constant pain he experienced in his lower back, legs, and right hand. (*Id.* at PageID.174). He rated his pain at an average of eight on a ten-point scale and indicated that the pain medication did not always help to alleviate his symptoms. (*Id.*). After he had surgery in August 2020, he testified that his symptoms worsened, and he has not experienced any improvement from physical therapy. (*Id.* at PageID.174–75).

A typical day for Plaintiff entails of lying in bed for most of the day as he is unable to stand, walk, or sit for long periods of time. (*Id.* at PageID.176). Occasionally, he will watch television, read books, and speak with family members

on the phone.  (*Id.* at PageID.183).  He does not have any hobbies, cook for himself, or go out very often.  (*Id.* at PageID.182).  His aide, who is present seven days a week, addresses a number of the daily living tasks for him.  (*Id.* at PageID.175, 181).  He testified that even if offered a 40-hour per week position where he could sit and stand at his discretion and lift weights no heavier than 15 pounds, he would still be unable to perform such a job.  (*Id.* at PageID.172, 183).

- **Vocational Expert's Testimony**

Judith Findora, Vocational Expert ("VE"), also testified during the hearing. The VE testified that Plaintiff's previous position as a yard worker, DOT Code 301.687-018, would be categorized as "[h]eavy per the DOT, [but] light as performed [by Plaintiff]" and the restoration cleaner, DOT Code 389.664-010, would be categorized as "heavy per the DOT, light to medium as described." (*Id.* at PageID.184, 186–87).

The ALJ posited a scenario to the VE describing a hypothetical individual of Plaintiff's age, education, and work history, who is able to perform light work as defined by the regulations except he can frequently climb ramps or stairs, limited to frequent handling, feeling and fingering, and must avoid concentrated exposure to vibration. (*Id.* at PageID.184).  The VE testified that such an individual would be able to perform the "yard work[ ] as generally performed with just the grass cutting [portion]." (*Id.* at PageID.184–85).  If the individual were absent from work two or

15

more times, even with a medical excuse, these absences may become work preclusive. (*Id.* at PageID.175, 185). If the hypothetical individual were "limited further by psychological symptoms to simple, routine tasks, and work that had only occasional changes in the work setting" the VE testified he would not be able to perform any of his past work. (*Id.* at PageID.185).

During cross examination, the VE conceded that while performing the yard work, said individual would have to be on their feet more than four hours a day. (*Id.* at PageID.187–88). And if the individual needed to lay down at their own discretion and beyond the number of allotted scheduled breaks, this would preclude him from this line of employment. (*Id.* at PageID.188). The VE also testified that her testimony that grass cutting is just a portion of a yard work and the amount of acceptable absenteeism was based on her professional experience. (*Id.* at PageID.186). Her remaining testimony was made consistent with the Dictionary of Occupational Titles. (*Id.* at PageID.185–86).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2018); 42 U.S.C. § 1382(c)(a)(3)(H). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and

nonmedical sources. An acceptable medical source means a medical source who is

a:

    (1) Licensed physician (medical or osteopathic doctor);

    (2) Licensed Psychologist, which includes:

        (i)    A licensed or certified psychologist at the independent practice level; or

        (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

    (3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

    (4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

    (5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

    (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021); 20 C.F.R. § 416.902(a) (2018).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." 20 C.F.R. § 404.1502(d); 20 C.F.R. § 416.902(i).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." 20 C.F.R. § 404.1502(e); 20 C.F.R. § 416.902(j). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1502c(a); 20 C.F.R. § 416.902c(a). "The most important

factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" 20 C.F.R. § 404.1520c(c)(1); 20 C.F.R. § 416.920c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" 20 C.F.R. § 404.1520c(c)(3); 20 C.F.R. 416.920c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."  20 C.F.R. § 404.1520c(c)(4); 20 C.F.R. 416.920c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other factors that "tend to support or contradict a medical opinion or prior administrative

medical finding."  20 C.F.R. § 404.1520c(c)(5); 20 C.F.R. 416.920c(c)(5).  "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."  The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record."  20 C.F.R. § 404.1520c(b)(1); 20 C.F.R. 416.920c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together

in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.*  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).   As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision."  20 C.F.R. § 404.1520c(b)(3); 20 C.F.R. 416.920c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." 20 C.F.R. § 404.1520c(d); 20 C.F.R. 416.920c(d). In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." 20 C.F.R. § 404.1520b(c); 20 C.F.R. 416.920b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)   Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)   Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

20 C.F.R. § 404.1520b(c); 20 C.F.R. 416.920b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." 20 C.F.R. § 404.1504; 20 C.F.R. 416.904. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f); 20 C.F.R. 416.913(a)(1). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate

24

specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1502(g); 20 C.F.R. 416.902(l). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." 20 C.F.R. § 404.1502(c); 20 C.F.R. 416.920(g).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical

impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."  20 C.F.R. § 404.1529(a); 20 C.F.R. 416.929(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you."  20 C.F.R. § 404.1529(a); 20 C.F.R. 416.929(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work."  *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms."  20 C.F.R. § 404.1529(c)(3); 20 C.F.R. 416.929(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or

aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)    [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." 20 C.F.R. § 404.1530(a); 20 C.F.R. 416.930(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." 20 C.F.R. § 404.1530(b); 20 C.F.R. 416.930(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

20 C.F.R. § 404.1530(c); 20 C.F.R. 416.930(c).

## G. Arguments and Analysis

### a.     Lack of Substantial Evidence

First, Plaintiff argues that the ALJ did not rely upon substantial evidence when finding that he could have continued to perform yard work while he was home recovering from his injuries.[2]  (ECF No. 12, PageID.1897–98, 1910).  In essence, he argues the ALJ's finding at Step Four that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can frequently climb ramps or stairs" and "is limited to frequent handling, feeling, and fingering, bilaterally" but "must avoid concentrated exposure to vibration" is incorrect.  (ECF No. 6-2, PageID.105).  The Commissioner counters that Plaintiff has failed to show that the ALJ's RFC finding is unsupported by substantial evidence.  (ECF No. 14, PageID.1930).  To support his finding, the ALJ cited to several portions of the record including (i) Plaintiff's medical records; (ii) Plaintiff's testimony, (iii) reports from David Mika, D.O. and Alyce Metoyer, D.O., state agency medical consultants, and (iv) medical statements from Dr. Michael Owczarzak and Jaafer Beydoun, NP.

---

[2] Plaintiff argues that the ALJ committed reversible legal error by asserting that he could perform his past relevant work as a yard worker "since his alleged onset date of disability [i.e., October 9, 2018], despite being so debilitated he required spinal surgery." (ECF No. 12, PageID.1910).  This argument slightly misses the mark as when filing for Social Security Income under Title XVI the operative date is the application date (i.e., August 15, 2019), and not the alleged onset date of disability (i.e., October 9, 2018).  Thus, for purposes of awarding SSI benefits under Title XVI, the ALJ was not required to assess his status prior to August 15, 2019.  However, if he had applied for Disability Insurance Benefits, it is possible the alleged disability onset date would have been applicable.

The majority of Plaintiff's arguments regarding the lack of substantial evidence focus on the ALJ's (i) citations to specific portions of Plaintiff's medical records, (ii)  decision to find the medical statements presented by Plaintiff's providers as not persuasive, and (iii) decision to find the state agency medical consultants' reports as partially persuasive.  First, I will provide a brief overview of the medical records, discussing Plaintiff's low back pain, specifically discussed in the ALJ's decision which are as follows:

- September 2019 VMC Record[3] – Decreased range of motion of the lumbar spine, tenderness, crepitus, and muscle spasms; no neurological deficits; no difficulty walking or standing; upper and lower extremities were within normal limits; normal sensations and reflexes.   (ECF No.  6-2,  PageID.107  (citing  ECF  No.  6-8, PageID.928–30)).

- October 2019 VMC Record – Noted numbness in lower extremities but no difficulty walking or standing, intact sensation, reflexes in his upper/lower extremities within normal limits, and cranial nerves II

---

[3] The September 2019 record was created after the date of the accident and the date of the application but before Plaintiff's surgery in August 2020.  While the record reflects "[n]o difficulty walking and standing" it also notes that Plaintiff had a "[d]ecreased [r]ange of motion of the lumbar spine, positive tenderness to motion, positive muscle spasms, positive crepitus, no neurological deficits."  (ECF No. 6-8, PageID.928).

to XII grossly intact.  (ECF No. 6-2, PageID.107 (citing ECF No. 6-8, PageID.1061–64)).

- February 2020 VMC Record – Tenderness to palpation of the lumbar spine but no difficulty walking or standing, upper and lower extremities within normal limits, cranial nerves II to XII grossly intact, and sensation within normal limits.  (ECF No. 6-2, PageID.107 (citing ECF No. 6-8, PageID.1119–22)).

- May 2020 VMC Record – Normal range of motion in neck, no difficulty walking or standing, upper/lower extremities were within normal limits, normal reflexes, cranial nerves II to XII grossly intact, and sensation within normal limits.  (ECF No. 6-2, PageID.108 (citing ECF No. 6-12, PageID.1763–66)).  The record also notes Plaintiff's complaints of lower back pain while the notes state that he had no difficulty walking or standing.  (ECF No. 6-2, PageID.108 (citing ECF No. 6-12, PageID.1764)).

- August 2020 Insight Institute of Neurosurgery and Neuroscience Record – During the office visit Plaintiff was alert and oriented, had full five out of five strength throughout the upper and lower extremities, and sensation was intact.  (ECF No. 6-2, PageID.108 (citing ECF No. 6-8, PageID.1219–20)).

The ALJ then goes on to cite evidence postdating Plaintiff's August 2020 lumbar laminotomy surgery.

- September 2020 Insight Institute of Neurosurgery and Neuroscience Record post operative treatment notes – Plaintiff experienced slight relief following the procedure and rated his pain between a 4 and 5 on a 10-point scale.  (ECF No. 6-2, PageID.108 (citing ECF No. 6-8, PageID.1223)).

- April 2021 Insight Institute of Neurosurgery and Neuroscience Record treatment notes – Plaintiff experienced improvement following the surgery but it was likely that he would continue to experience chronic pain.  (ECF No. 6-2, PageID.108 (citing ECF No. 6-12, PageID.1737)).

- May 2021 Physical Therapy FUV record – Plaintiff was tolerating his manual therapy treatment well and reported feeling a decrease in pain levels after the treatment.  (ECF No. 6-2, PageID.108 (citing 6-12, PageID.1721)).

Based on these medical records, the ALJ declined to find any of the prior administrative medical findings or medical opinions fully persuasive.  (ECF No. 6-2, PageID.109).

### (i)    David Mika's, D.O. and Alyce Metoyer's, D.O. Disability Determinations

The ALJ found that the record partially supported David Mika's, D.O., (ECF No. 6-4, PageID.193–207) and in turn Alyce Metoyer's, D.O. confirmation of Mika's opinion (ECF No. 6-4, PageID.210–25), findings.  (ECF No. 6-2, PageID.109–10).  However, he disagreed with the state agency's opinion that Plaintiff should have limitations in "climbing ladders, ropes, or scaffolds, crawling, balancing, stooping, kneeling, or crouching" based on his review of the record.  (*Id.*).  The ALJ stated the records show that Plaintiff had intact sensation, normal reflexes, normal gait, no difficulty walking or standing, and full five out of five strength on several occasions.  (*Id.* at PageID.110).  While the ALJ's conclusion to find the medical agency opinions only partially persuasive is supported by substantial evidence, the Social Security Rulings and caselaw provides further instruction as to on what basis this finding is supported.

Mika's report was signed on October 15, 2019 and assessed Plaintiff 's application, dated August 15, 2019, for disability beginning on October 9, 2018. (ECF No. 6-4, PageID.203).  Notably, the medical records reviewed and relied upon by Mika ranged from November 2018 to July 2019, in contrast to the medical record period discussed by the ALJ which ranged mostly from September 2019 to May 2021.  (ECF No. 6-4, PageID.197).  The ALJ also found that Alyce Metoyer's report, signed on December 12, 2019, was not persuasive using the same medical record

33

date range as that used for Mika.  Notably, Metoyer's findings identify the medical

records reviewed and relied upon as documents which ranged from November 2018

to October 2019.  (ECF No. 6-4, PageID.214–17, 221).

At first glance, it might appear a bit perplexing that the ALJ would rely on

medical documents detailing medical observations and reports created months after

Mika's report was finalized and signed to partially undermine both Mika's and

Metoyer's reports.  However, a review of Social Security Ruling ("SSR") 18-1p

provides insight and guidance as to why the ALJ's approach, and ultimate decision,

to find the reports only partially persuasive was correct.  SSR 18-1p governs the

determination of established onset date (EOD) in disability claims and reads as

follows:

> To be entitled to disability benefits under title II of the Act
> or to be eligible for Supplemental Security Income (SSI)
> payments based on disability under title XVI of the Act, a
> claimant must file an application, meet the statutory
> definition of disability, and satisfy the applicable non-
> medical requirement.  If we find that a claimant meets the
> applicable non-medical requirements during the period
> covered by his or her application, we then determine the
> claimant's EOD ["Established Onset Date"].  Generally,
> the EOD is the earliest date that the claimant meets both
> the definition of disability and the non-medical
> requirements for entitlement to benefits under title II of the
> Act or eligibility for SSI payments under title XVI of the
> Act during the period covered by his or her application.
> **Because entitlement and eligibility depend on non-
> medical requirements, the EOD may be later than the
> date the claimant first met the definition of disability,
> and some claimants who meet the definition of**

**disability may not be entitled to benefits under** title II
or **eligible for disability payments under title XVI**.

(emphasis added).  The SSR goes on to explain that if "a claimant applies for SSI

payments based on disability under title XVI of the Act after the first month that he

or she meets the other eligibility requirements, . . . SSI payments based on disability

for the month in which the application was filed or any months before that month"

cannot be made.  In essence, retroactive payments cannot be issued based on a

disability under title XVI of the Act.  20 C.F.R. § 416.335; *see Kelley v. Comm'r*,

566 F.3d 347, 349 n. 5 (3d Cir. 2009); *see also Newsom v. Soc. Sec. Admin.*, 100 F.

App'x 502, 504 (6th Cir. 2004).  Thus, "a claimant who has applied for SSI payments

under title XVI must show that he or she currently meets the statutory definition of

disability during the period under consideration" and any period beyond that point

will not be considered.  SSR 18-1p; *Duncan v. Colvin*, No. 14-5264, 2015 WL

4916804, at *2 (W.D. Ark. Aug. 17, 2015).

Under SSR 18-1p, the use of August 15, 2019 as the disability start date is

appropriate.  And the proper inquiry on Plaintiff's SSI benefits application is

whether he was disabled on or after the application date.  *Casey v. Secretary*, 987

F.2d 1230 (6th Cir. 1993).  "Thus, Plaintiff has the burden of proving that []he was

disabled between [August 15, 2019], the SSI application date, and [August 25,

2021], the date of the ALJ decision, to be entitled to SSI benefits.  *Brown v. Comm'r*

*of Soc. Sec.*, No. 07-CV-11409, 2008 WL 2622959, at *3 (E.D. Mich. July 2, 2008).

The ALJ found the state agency's opinions partially persuasive because Mika and Metoyer provided support for some of their findings, notably "the claimant's lumbar degenerative disc disease with radiculopathy, cervical degenerative disc disease, and bilateral carpal tunnel" (ECF No. 6-2, PageID.109) which was supported by, and consistent with the overall record, importantly the additional medical evidence fall within the considered time period for SSI benefits.  (ECF No. 6-8, PageID.1061, 1065).  However, he found the limitation "in climbing ladders, ropes, or scaffolds, crawling, balancing, stooping, kneeling, or crouching" was not supported by the overall record and goes on to cite several records which demonstrate this.  (ECF No. 6-2, PageID.110 (citing ECF No. 6-9, PageID.1314–15 (March 2019 record reflecting increase in bilateral strength and decrease in "annoyance" of right hand paresthesias); ECF No. 6-12, PageID.1777–78, 1789–92, 1817–20) (October 2020, November 2020, and June 2021 VMC records noting no neurological issues, no difficulty walking or standing, normal examination of right and left examination of lower extremities).  While the ALJ explicitly includes records mostly from 2020 and 2021 to support his finding, this is not to say that earlier records were not considered and reviewed during his assessment.  In fact, Plaintiff's records contain additional treatment notes which support the ALJ's finding.  And as the court has the authority to review the administrative record as a whole, and consider any evidence in the record, regardless of whether it has been

cited by the ALJ, it has done so here.  *See Walker v. Sec'y of Health & Human Servs.*,
884 F.2d 241, 245 (6th Cir. 1989). While many of Dr. Shah's treatment notes include
indications of Plaintiff experiencing pain, discomfort, and recommendations for
Plaintiff to remain off work  (ECF No. 6-8, PageID.726-27, 729, 1070 (April 2019,
July 2019, and September 2019 treatment notes)) treatment records created at VMC
around the same time frame reflect that while Plaintiff experienced various levels of
discomfort, he had no difficulty walking or standing.  For example, the April 2019,
June 2019, and August 2019 VMC treatment notes indicated DDD of the lumbar
spine with an active onset date of November 12, 2018 and bilateral carpal tunnel
syndrome but do not include indications of difficulty walking.  (*Id.* at PageID.763,
767–68, 772, 775, 779, 795).  Moreover, records created earlier in time further show
that while Plaintiff experienced pain and discomfort he did not have difficulty
walking or standing.  The November 2018 Valley Medical Center ("VMC") notes
reflect Plaintiff had "[n]o difficulty walking or standing" while there was "[p]ositive
tenderness to back from neck to lumbar spine" and "positive decreased sensation to
right hand."  (ECF No. 6-8, PageID.739–40).  In December 2018, the VMC notes
again reflect Plaintiff had "[n]o difficulty walking or standing" and there was a
normal examination of right upper extremity but also note bilateral carpal tunnel
syndrome.  (*Id.* at PageID.747).  The January 2019 VMC medical note indicated
Plaintiff was complaining of back pain and had a history of degenerative disc disease

("DDD") of the lumbar spine from his fall, and neuralgia to right hand. (*Id.* at PageID.749–750). The notes also reflect that although he complained of back pain he had "[n]o difficulty walking or standing." (*Id.* at PageID.750). Tellingly the January 2019 Physical Therapy FUV shed some light on what may appear to be a confusing, and at times conflicting medical record. The notes indicate that while Plaintiff self-reported experiencing a pain level of nine on a ten-point scale associated with his lower back the notes indicated that Plaintiff's "affect [did] not give [an] indication of 9/10 pain" and that he ambulated with a normal gait. (*Id.* at PageID.718, 720).

Guided by SSR 18-1p and the medical record, the undersigned finds that the ALJ was correct in finding both Mika's and Metoyer's reports partially persuasive. Further, this finding is supported by substantial evidence as discussed above.

### (ii)   Dr. Michael Owczarzak's Medical Source Statement

Plaintiff also argues that despite the substantial evidence supporting Dr. Owczarzak's medical source statement, the ALJ failed to properly apply 20 CFR § 416.920c and improperly rejected Dr. Owczarzak's statement. The Commissioner counters that the ALJ reasonably discounted "the more extreme physical limitations" proffered by Dr. Owczarzak. (ECF No. 14, PageID.1937).

38

The ALJ found Dr. Owczarzak's opinion not to be persuasive because while "examination prior to surgery did show decreased range of motion, tenderness, crepitus, and muscle spasms, the claimant had no neurological defects." (ECF No. 6-2, PageID.110).   More importantly, the ALJ observed that Dr. Owczarzak's treatment notes provided little support for his findings and the limitations were not consistent with the overall record especially since the claimant reported improvement after surgery.  (*See id.*; *see also* ECF No. 14, PageID.1939).

First, it is worth noting that all of the medical evidence cited by Plaintiff to bolster his position that substantial evidence exists to support Dr. Owczarzak's medical source statement predates the time period for which Plaintiff would be entitled to be paid SSI benefits.  (*See, e.g.*, ECF No. 12, PageID.1916–17 (citing ECF No. 6-8, PageID.454 (2018 record); ECF No. 6-8, PageID.465, 475 (2018 record); ECF No. 6-8, PageID.809 (02/2019 record); ECF No. 6-8, PageID.835 (07/2019 record)).  Thus, while this medical evidence was considered by the ALJ per 20 CFR 416.912, the most salient evidence is that which could support Plaintiff's contention of disability during the period for which he would be eligible to receive SSI benefits.

In comparison, the ALJ highlights a number of treatment notes, which both predate and postdate Dr. Owczarzak's medical source opinion, that demonstrate Plaintiff had normal results regarding his mobility (e.g., normal ambulation,

extremities within normal limits, reflexes normal, etc.).  (ECF No. 6-2, PageID.110 (citing ECF No. 6-8, PageID.927–30 (dated September 2019); ECF No. 6-8, PageID.1227–28 (dated September 2019); ECF No.6-8, PageID.1233–34 (dated January 2021); ECF No. 6-12, PageID.1817–20 (dated July 2021)).  In his decision, the ALJ specifically highlights an example of a medical record which does not support Dr. Owczarzak's medical source opinion — September 2019 Valley Medical Center record which shows that although Plaintiff had a decreased range of motion of the lumbar spine, tenderness, crepitus, and muscle spasms but he did not have neurological deficits, difficulty walking, or standing.   (ECF No. 6-2, PageID.107 (citing ECF No. 6-8, PageID.928–30)).  Further, his upper and lower extremities were within normal limits and had normal sensations and reflexes.  (*See id.*).  The record itself contains several additional treatment notes which support the ALJ's finding that the overall record does not support Dr. Owczarzak's statement. (*See, e.g.,* ECF No. 6-8, PageID.739–40 (November 2018 Valley Medical Center treatment note noting that Plaintiff had no difficulty walking or standing); ECF No. 6-8, PageID.1061–64 (October 2019 Valley Medical Center treatment notes noting that Plaintiff had no difficulty walking or standing despite noted numbness in lower extremities); ECF No. 6-8, PageID.1119–22 (February 2020 Valley Medical Center treatment note noting that Plaintiff had no difficulty walking or standing despite tenderness to palpation)).  Thus, the ALJ's rejection of the medical source statement

was supported by substantial evidence.  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th

Cir. 2001) (An ALJ does not err in "discounting the inconsistent and unsupported

portions of" a treating physician's medical source statement).[4]  Further, this Circuit

has found that instances where medical source statements such as Dr. Owczarzak's,

"check-box opinions," are submitted ALJS are not bound by the conclusory

statements contained within them.[5]

---

[4] In *Hogan*, the court found the ALJ properly discounted the physician's opinion in instances where the ALJ found that the limitations "stand alone" or were never mentioned in the doctor's treatment notes and were not "supported by any objective testing or reasoning which would indicate why the claimant's functioning need be so restricted."  *Id.* Similar to *Hogan*, the ALJ pointed out that Dr. Owczarzak's medical source statement finds "little in the way of support for [his] findings" in his own treatment notes.  (ECF No. 6-2, PageID.110).

[5] Dr. Owczarzak's two-page medical source statement can be categorized as what courts in this Circuit have previously referred to as a "check-box opinion," which notably lacks any detailed citation, explanation, narration, or analysis to support his opinions.  (ECF No. 6-8, PageID.951).   Markedly, in the section reserved for additional information regarding "clinical signs, diagnostic techniques, laboratory tests, observations, reports and other evidence" to support his diagnoses and the functional deficits described in the report Dr. Owczarzak merely rattles off a few medical terms such as "lumbar spine tender" and "decrease straight leg raise bilat[eral]" unaccompanied by any additional detail.  (ECF No. 6-8, PageID.952).   This medical opinion provided very little by way of support or explanation as to why Plaintiff is only limited to sitting for 3 hours, standing for an hour, or walking for thirty minutes in an 8-hour workday or why he is extremely limited when it comes to bending, squatting, kneeling or stooping.  (*Id.* at PageID.951).   Courts in this Circuit have held that when presented with medical source statements which appear to be nothing more than "check-box forms" ALJS are not bound by the conclusory statements contained within.  *Nichols v. Berryhill*, No. 16-14072, 2018 WL 2181463, at *3 (E.D. Mich. Jan. 25, 2018) ("Courts in this circuit have held that a medical source statement in 'check-the-box' format, by itself, provides little to no persuasive value — to hold otherwise would neglect its flaring lack of narrative analysis.") (citation and quotation omitted); *Bayes v. Berryhill*, No. 3:16-cv-2822, 2018 WL 791323, at *2 (N.D. Ohio Feb. 8, 2018) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.") (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)); *Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659, 2000 WL 799332, at *1, *6 (6th

Finally, Plaintiff argues that to support his finding the ALJ "repeatedly cherrypicked the same unreliable statements from Plaintiff's electronic chart which incorrectly stated Plaintiff had no problems with ambulating." (ECF No. 12, PageID.1918). He describes these notes as "false negatives set as defaults in the modern electronic chart." (*See id.*). Plaintiff merely tosses this theory that the statements demonstrating Plaintiff had no issues ambulating and no gait are "false negatives" but provides no underlying support (e.g., secondary source citation to support this contention) or flesh out this argument. He then argues that it was illogical for the ALJ to infer that because there was evidence Plaintiff experienced greater function following surgery that he possessed the same ability prior to surgery. (*See id.*). But as discussed above, the undersigned finds this argument unpersuasive as the ALJ cited medical records which pre- and postdate Plaintiff's surgery to support his RFC finding. *Supra* p. 35.[6]

### (iii)   Jaafer Beydoun, NP's Medical Source Statement

---

Cir. 2000) ("[T]he ALJ had ample reason not to credit [the treating physicians'] reports. Both reports consist simply of forms in which spaces are filled out and boxes are checked off. Neither explains how the authors arrived at their diagnoses."). Thus, it is possible that any potential error by the ALJ finding  Dr. Owczarzak's opinion not to be persuasive is inconsequential in this instance.

[6] In his reply, Plaintiff argues that "[i]f the ALJ thought there had some evidence of improvement following surgery, he should have instead at least considered a closed period of eligibility before the post-op recovery period." (ECF No. 12, PageID.1919).  The undersigned suggests this point is not persuasive as, again, the ALJ cited to medical records which both predated and postdated Plaintiff's surgery to support his RFC finding.  Thus, based on the record it is unlikely that the ALJ would have found Plaintiff disabled during a closed period of eligibility prior to his surgery in August 2020.

While Plaintiff does not provide a detailed argument as to why the ALJ's decision to reject Jaafer Beydoun's, NP medical source statement was improper, the Commissioner addresses this argument by pointing out the inconsistencies in Nurse Beydoun's June 2021 and highlighting the lack of support. (ECF No. 14, PageID.1941–42).   Similar to Dr. Owczarzak's medical source statement, Beydoun's medical source statement is unsupported by Plaintiff's medical record. *See supra* G(a)(ii).[7]  In fact, Beydoun's June 2021 statement is more restrictive than Dr. Owczarzak's 2020 statement although Plaintiff's 2020 and 2021 treatments demonstrate a notable increase in improvement.  (*See* ECF No. 6-2, PageID.110 (citing ECF No. 6-12, PageID.1736–37 (April 2021 Insight Institute of Neurosurgery and Neuroscience Record treatment notes stating Plaintiff experienced improvement following the surgery but was likely to continue to have chronic pain)); *see also* ECF No. 6-12, PageID.1721 (May 2021 Physical Therapy FUV record noting Plaintiff was tolerating his manual therapy treatment well and reported feeling a decrease in pain levels after the treatment).   Based on the undersigned's review of the record, the ALJ's decision to find Beydoun's June 2021 statement not persuasive was supported by substantial evidence.

### b.    ALJ'S RFC Determination

---

[7] *See supra* n. 5.

Plaintiff argues that the VE inappropriately disagreed with the DOT's classification of yard work as heavy. (ECF No. 12, PageID.1912). And second, the hypothetical presented to the VE was incorrect as substantial evidence does not exist to support that Plaintiff has retained the ability to stand and walk either (i) 4 hours every day, of an 8-hour day, 5 days a week, or (ii) 6 hours every day, of an 8-hour day, 5 days a week. *See id.*

The Commissioner argues that the ALJ appropriately relied on the VE's testimony to support finding that Plaintiff could perform his past work as he performed it. (ECF No. 14, PageID.1947). The Commissioner explains that Plaintiff misinterprets the VE's testimony and that the VE did not disagree with the DOT's classification of yard worker but instead "clarified that the grass cutter duties that Plaintiff actually performed at the light level were simply one aspect of the DOT No. 301.687-018's more expansive job title of yard worker." (ECF No. 14, PageID.1949 (citing ECF No. 6-3, PageID.184–90)). And because the VE's response to the hypothetical posed by the ALJ was in response to his work-related limitations that the ALJ determined were supported by the record then the ALJ appropriately relied on the VE's testimony in "concluding that Plaintiff could return to his past relevant work as a yard worker, as he actually performed that job. . . ." (ECF No. 14, PageID.1949).

Plaintiff's first argument regarding the VE's categorization of yard work as light can be summarily addressed based on a plain reading of the VE's testimony. The testimony demonstrates that Plaintiff's representation of her testimony regarding the categorization of yard work as he performed it misses the mark. (ECF No. 6-3, PageID.186–88). The VE did not testify that she disagreed with the DOT's categorization of yard work as heavy work but instead would categorize Plaintiff's performance as a grass cutter, which falls within the purview of yard work, as light. (*See id.* at PageID.186). Thus, the Commissioner's position on this argument is more persuasive.

Plaintiff's argument regarding the lack of substantial evidence to support a finding that he could stand or walk for either (i) 4 hours every day, of an 8-hour day, 5 days a week, or (ii) 6 hours every day, of an 8-hour day, 5 days a week is unpersuasive. First, as demonstrated by both the record and Plaintiff's own motion[8], there is very little medical evidence from the relevant time period (i.e., post August 2019) to support his position that he is unable to stand or walk for either 4 or 6 hours every day. Second, the same medical agency reports that Plaintiff at one point uses to argue his position that the ALJ's RFC assessment "is detached from reality", *see*

---

[8] Most of the medical evidence cited by Plaintiff in his motion to bolster his position that he should be found disabled predates the relevant medical period (i.e., August 15, 2019 onward). (*See, e.g.,* ECF No. 12, PageID.1916–17 (citing ECF No. 6-8, PageID.454 (2018 record); ECF No. 6-8, PageID.465, 475 (2018 record); ECF No. 6-8, PageID.809 (02/2019 record); ECF No. 6-8, PageID.835 (07/2019 record)).

ECF No. 12, PageID.1919–20,  conclude that Plaintiff can stand and/or walk about 6 hours and sit about 6 hours in an 8-hour workday.  (ECF No. 6-4, PageID.201, 219).  Third, and more importantly, as discussed above in Sections G(a)(ii) and (iii), the medical record submitted with Plaintiff's SSI application contains substantial evidence to support the ALJ's RFC finding.  Plaintiff's treatments notes from late 2019 to 2020 demonstrate that while he was in pain, he was still able to ambulate and at numerous points walked without a gait.  (*See supra* Section E – Medical Evidence and G(a)).  Thus, the undersigned finds that substantial evidence exists to support the ALJ's RFC finding.

### H.  Conclusion

For the reasons outlined above, I recommend **DENYING** Plaintiff's Motion (ECF No. 12), **GRANTING** the Commissioner's Motion (ECF No. 14), and **AFFIRMING** the case.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1.) Failure to file specific objections constitutes a waiver of any further right

of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981.) The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d.) The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 13, 2023                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge